Next on our docket this morning is United States v. Canada, number 21-3202. Counsel, you may proceed. Am I pronouncing the defendant's name properly? Yeah, just like the country, Canada. Judge Matheson, and may it please the Court,  I represent John Canada. An officer conducted a protective search of Mr. Canada's vehicle in this case. At the time the search was conducted, the officer didn't know who Mr. Canada was. So this case really isn't about John Canada. It's sort of about all of us, anybody in that vehicle, in this case, whatever you decide, it will apply to them. The issue, the question, is essentially whether the officer had reasonable suspicion to do what he did. We don't think the officer did, sort of given two reasons. The first, and this is based on the Supreme Court's decision in Michigan v. Long, sort of two prongs. The first is that the officer needs reasonable suspicion that the individual in the vehicle is presently armed and dangerous, and the second is that the officer needs reasonable belief that the individual has access to any weapons in the vehicle. We think the district court got both prongs wrong. Counsel, do you think that the district court was right, in terms of what it said at the hearing before it ruled that this is really about a furtive gesture? Pretty much, yes. So how do we review what the court said at the hearing? How does that get incorporated into our review, de novo review of the reasonable suspicion ruling? So I think you can consider it. The case, there's this case from 1982, Pappas. It's cited in the briefing. And my reading of that case is that when a district court sort of supplements its order with oral statements, that those oral statements can be considered by the court. And I think that makes sense because, especially in this case, I think everything Judge Malgren said at the hearing is just sort of consistent with the written order. I mean, the written order is super brief. But there are two components, right? There was the slow roll and the gesture, right? So we've made a pitch that those two things go to the sort of one continuous furtive type thing. But, yes, the government sort of treats those two things as different, and the court cited both. So we don't agree with you that it's all sort of one thing, that it's slow roll, furtive gesture. Do Ridley and Humphrey help you? Don't those cases only do work for you if it's just a furtive gesture case? I think that's fair, yes. Yeah, I think that's fair. I'm not going to push back too hard on that because I don't think we need that to win this case. But I think that is fair. So, you know, turning to the facts, I think. Let's talk about the slow roll. Okay. So, I mean, he said there was a slow roll. He didn't give it much weight, I don't think. Correct. Right, but he did rely on it at least to some degree. Correct, I agree. And so his determination that there was indeed a slow roll, it would be your burden to show by clear error that that was wrong. Well, I mean, I'm not arguing the historical facts are. I'm not arguing that the district court got the historical facts wrong. I think everyone agrees that it took him roughly 14 seconds to pull over when those lights went off, that there's no clear error with respect to the historical facts. Right. So I don't understand why clear error review would apply in that context. To me, it is this court determining on its own whether that amount of time considered abnormal, what weight to give it. Well, I guess what the court was deciding was not whether it occurred in 14 seconds because he knew it did.  And that 14 seconds was longer than necessary to pull over, or otherwise being a slow roll. Or that the officer thought it was a slow roll. I mean, that's fair. Okay. Yeah. And would you agree? So part of what's going on here in this case is this idea that all we have is a furtive gesture. Yeah. Or one continuous act that's a furtive gesture, and a furtive gesture by itself is not enough to allow a protective sweep. And is it your position that that's true for all furtive gestures? I mean, could there be a furtive gesture in your mind that is so suspicious looking that it would give an officer a reason to believe that someone had hired or had hidden a firearm or a weapon? I don't know. I mean, I guess I would just quote your language back to you. I mean, the Tenth Circuit is the one who said that's furtive gesture standing alone. Well, we said that in dicta in an unpublished opinion. True. And the authorities to look at it beside us have not necessarily agreed with that. Yeah. I mean, I get the point that, you know, if you have someone who looks like somebody's hiding a bomb or something, maybe that's the example. Fair enough. But are you connecting that to sort of knowledge that the officer would have when looking at the gesture? I think so, yeah. I mean, this is all contextual, right? It's a totality of the circumstances test. So I think I get, I take the point that when you focus on one factor in a totality of the context, that factor can mean something different. I'm assuming you've seen the video. Oh, yeah. Okay. So I look at that video and it was not a subtle, it was not a subtle movement into the backseat by the defendant. It looked dramatic to me, frankly. Like a real strong, I mean, the record will not reflect this, but like a real strong move behind the seat. Yeah. And, you know, there could be, you know, a subtle move versus one that looks like you're obviously trying to hide something, seems to me could be different. Okay. I mean, if that's how you view it, that's how you view it. Mr. Cannon is a large man. No, okay. So let me phrase it differently so it's not about how I'm viewing it. Yeah. Let's just talk about it hypothetically where we can both agree that one move was a subtle move, one move was a dramatic move. Okay. And would you agree with me that the dramatic move might give officers more reason to believe something's being hidden? I mean, I would agree with you that an officer might say that, and we would be having the same conversation, whether it was subtle or dramatic, to be honest with you. Yeah. I mean, that's been my experience that things are suspicious either way they go. Right. But if I can make a few points on the word movement because I think what frustrates me about this case is, you know, there are two inferences you can draw from his reaching behind the seat. The first is that he was retrieving something. That inference, the only way that inference makes sense in this case is that he was retrieving his wallet because when the officer walks up to the car, he has his identification in his left hand, his wallet in his lap, his right hand's empty. They take him out of the vehicle, move him to the back, frisk him. He doesn't have anything else. So if he was retrieving anything, it was the wallet. That doesn't, that's not dangerous. So the other inference is that he was putting something behind the seat. Okay. So that's fine. Call that a reasonable inference. But how do you then infer that what he put behind the seat was a dangerous weapon? That's the first point. I mean, isn't the problem, though, sort of that how do you infer that it, I mean, you can never be sure that what he was putting behind the seat was a weapon. But in all kinds of cases where there's a furtive movement plus, they've done a protective sweep to determine if there was, in fact, a weapon. And those have been upheld. But I think the facts are different because there was something plus in those cases. But if I can just, if we accept the inference that, yes, maybe it was a weapon, I still think there's a problem with an additional inference that you have to make that this means that the individual in the car is dangerous. Because what that means, if an individual has put a gun or a dangerous weapon under the seat, he has disarmed himself. I mean, an officer is walking to the vehicle and he has disarmed himself. To draw an inference from that fact that he is a danger to the officers, I mean, honestly, doesn't make sense to me. I just, I don't follow that logic. So isn't that what takes us to the three scenarios in Michigan v. Long? So that the second problem, I mean, we can talk about this. I don't know that that gets us to, as I understand, Well, if I understand what you just said, you're saying, well, if he put the gun or something else under the seat, he's disarmed himself. But there's still the concern that he could get back in the car and grab. That's just the Michigan v. Long scenario. And I'm just asking you if that's where things are now going with your argument. That's not, that wasn't my point. I think before you get to the second problem, in order to search, period, there has to be reasonable suspicion that the individual is not just presently armed but dangerous. I mean, he has to be a danger to the officers. And my basic point is that when an individual disarms himself as officers are approaching, it doesn't make sense to infer that that individual is a danger to the officers. That's my basic point. And I think that has nothing to do with the second problem. And so, I mean, I follow the logic. But when you bump up against the cases that say it's okay to go ahead and do the sweep, even if you're letting them go, because they might get back in the car and pull the gun on the cops and start shooting. I mean, how can that play? So are we talking about the first problem or the second? Your argument, if I understand your argument, it's about, you're arguing now first prong. I'm trying, I'm trying. Okay. I'm trying to argue the first prong. I can make an argument on the second problem, but I really, the second prong analysis, I think, is problematic in this case for the government because the search happens so quickly. And I think when you look at the cases that are second prong cases, there are cases where the officers have determined the individual is going to be released back into the vehicle. And here the officers did not know that. And so it is an absence of information on which you have to infer from. At what point are we supposed to analyze whether the officers were going to arrest or not arrest him for purposes of the second prong? I mean, I think that it has to be at the time of the search. At the time that Mr. Canada was asked to exit the car? I think the moment of the search. The moment of the search. I think that is black letter Fourth Amendment law. And the facts, well, let me put it, it's a question. When the officers decided to do the protective sweep, had they decided at that point whether to arrest him? They had no idea who he was. No, they didn't know who he was. They hadn't run a warrants check. So your answer is no to that. They hadn't decided yet. I can't imagine they would have because they didn't know who he was. They didn't know if there was an arrest warrant. I agree with you. I don't think they had decided yet. But the point is that in the Fourth Amendment context, the lack of information is not sufficient to establish suspicion or any of your standard Fourth Amendment. If they hadn't decided whether to arrest him, if they decided to arrest him outside the car, he wouldn't be getting back in the car. But if they hadn't decided to arrest him at that point, why wouldn't that support a reasonable decision to sweep to make sure he wouldn't gain access to a weapon if he wasn't arrested and was allowed to get back to the car? And I understand we're in prong two, prong one, dangerous. I'm just now in prong two. So the best way I can, and if I can answer this and try to reserve the remainder of time, the best way I can answer this is that there would be a moment at which, in your scenario, the officers would have figured out whether he was going to be released to the vehicle. And at that point, a valid protective search, assuming prong one is met, then that is on the table. But not until you get to that point does the search become constitutional under long second prong. If I can reserve that. We don't have the time on the screen here. So how much time has he got left? About 15 seconds. Okay. Don't start yet. We're trying to get the timer going. No. Do you mind doing that? No. That's fine. As long as we have something to keep track. I'm so sorry about that. I'm not sure where I even fell. Will that work? Sure. Okay. I'll do that. Thanks. May it please the Court, Molly Gordon on behalf of the United States. Your Honors, this Court has previously ruled in an en banc decision that the terrifying truth, and that's the language from this circuit, the terrifying truth is that officers have a real risk of being assaulted each time they stop a car. Based on the long line of cases that support that, great deference is given to officers to make split-second decisions. Your Honors, based on that, we would ask this Court to affirm the district court's denial of the motion to suppress. Counsel, I wanted to just make sure I understand your argument. There's a lot of discussion in your brief about a limited protective suite. That's not a thing, right? The fact, Long states that once the protective suite is allowed, you can search any place for the weapon. I bring that up just to show, in my mind, and I think the case law has referenced this before, where it is limited in time and scope. It just adds to the officer's good faith of what they were doing. Okay, but the scope doesn't impact the threshold decision about whether the search is constitutional at the outset, right? Correct. It does not impact the threshold decision, but the district court made note of it, and it appears that the district court used the limited scope and duration to add to the officer's credibility after they listened to the officers testify and watched the video. The district court did take note of that and made a note that it wasn't a free-for-all, that it was really a targeted search to the area where they were concerned. If I may ask one more question, just to clarify that I understand your argument. What is the totality of the circumstances that the government contends is that issue here? Is it what the district court found, which is slow roll sort of 5% plus furtive gesture, or is it more? So the district court ruled, as you said, judge the slow roll and the furtive gesture. The government believes that is enough to be able to affirm, but the officers also gave testimony about the fact that it is a high crime area and that it was night, it was dark, it was raining. Those factors have been mentioned in Terry analysis and Long analysis. The court didn't rely on them, but I cited a case that said that those factors were brought up. So if the court needed to go beyond what the district court did, it could. I don't think it needs to, but it's there. So if we. Let me, so your opposing counsel was talking about prong one of Long and he, his argument, if I was understanding it correctly, was basically when I reached behind my seat and stick my gun underneath it, I have effectively disarmed myself. So I'm no longer dangerous. Would you like to comment on that? Yes, your honor. Thank you. I think what's very clear is that there's absolutely no way for the officers to know whether someone that they encounter is disarming themselves or army themselves. And as you said, judge Carson, you watched the video. It was a dramatic movement. And I think that's really important because when we talk about, we use furtive gesture and that's really a search term that kind of gets us to these sorts of cases. But we're really talking about is a furtive gesture consistent with reaching for a weapon or hiding a weapon. And this is even more important when it's in response to police contact, as it was in this case. It wasn't just that they drove by him and looked over and just saw him reaching back. It's that they put the lights on, they were pulling him over, and in response to that police conduct, he had the dramatic gesture of his arms pinned back, his hips lift up, and he's reaching back. So I guess I'm trying to understand how that furtive gesture means weapon. I mean, why does the furtive gesture mean weapon? I mean, what you're saying is that if there's a movement, it is automatically consistent with firearms. I don't think it's any movement. And if you look through, there's lots of cases on furtive gestures. Some in the circuit and some outside of it. And what they were talking about is a furtive gesture consistent with reaching for a weapon. And here, you know, a lot of the cases talk about reaching under the front of the seat, reaching over to the side of the seat, reaching back behind the seat. Yes, there are a million innocent explanations, but reasonable suspicion does not require you to do away with innocent explanations. I mean, Terry itself was people walking back and forth in front of the store. Those could be innocent explanations. But if it's a furtive gesture that could be consistent with hiding or more concerning reaching for a weapon, which again, this officer would have no way to know the intent of Mr. Canada, whether he was. Well, if he was reaching, if he would, I mean, if he was reaching for the weapon, I mean, they ordered him out. Correct. All right. And so they order him out. And at that point, I mean, there's no weapon brandish. Nobody's concerned that there there's one because they've patted him down and cuffed him. And so then why search before you decide if there's going to be an arrest? So they did not cuff him, your honor. And so they found the gun. Okay. And so it all, it all happened pretty fast. Okay. So, but, but they had, they had him behind the car with two cops. One, your honor. So there were two of them back there for a while. The other one decided to go make the search. Correct. So he could have, he could have stood by and helped secure him while they determined whether they were going to let him go or not. They could have, your honor. But I think, you know, if you look at the record during the, in record, volume three, page 19, the officer testified that when he asked, the officer who's doing the search asks the other officer to get him far back. And he says, when I asked him why he did that, he said that he wanted some reaction room, some distance room. And I cite in my brief all sorts of cases where they have found that a defendant has an opportunity to reach back for a dangerous, to get back to the car and have a weapon, even when they've been handcuffed on a curb, even when it's two officers on the defendant versus one. So here it was a one-to-one situation where he's not handcuffed. And I think that, you know, the case law supports that. In this situation, they know they're in a high crime area. They, it's dark, it's raining. It's hard to see. He doesn't stop immediately, which they note verbally at the time. And the officers testified that in their training and experience, when someone takes an abnormal amount of time to stop, which the district court did find it was an abnormal amount of time. But the cases use the word prompt. I don't understand what abnormal means in this context. Well, I think that that's a factual finding that the district court made. The district court said that. The factual finding is that it was 14 seconds. Correct. And the court found that that was, I don't know if the court actually said that it was, if they went through the 14 seconds. I believe that was in the brief. But the factual finding is the historical fact. That would be reviewed for clear error. Whether that constitutes a slow roll that contributes to the reasonable suspicion determination is not reviewed for clear error. That's part of our de novo view. Correct. Yes, absolutely. Now I've lost Ryan. I'm sorry, but I was talking about the slow roll. What were we? I don't remember. I've lost it now that we've been talking about it. I can fill in the blank if you don't mind. Let's spot you the firearm. Can you speak to dangerousness? What supports the government's, what's your best argument on dangerousness here? On dangerousness? Do you mean the second prong or the first prong? I'm only interested in the first prong. The first prong. The best argument, Your Honor, is that the slow roll that he did not stop immediately in the officers and their training experience say that they know that someone is often trying to either hide contraband, hide a weapon, or retrieve a weapon. And then when they come up, the defendant's making this dramatic gesture. And, again, they have no way of knowing whether he's reaching for the weapon or hiding it. So you're saying both of the facts that support your armed conclusion also support dangerousness. There's no delta between those. It's the same set of facts. I believe so, Your Honor. Can someone be armed and not dangerous? Absolutely, Your Honor. Absolutely, someone can be armed and not dangerous. But that's not for the police. The whole point of the protective sweep is to ensure officer safety in the inherently dangerous traffic stops. Let me throw out a hypothetical. Let's flesh out this dangerousness idea. Would you see a difference if the police pulled up and someone was not engaged in a furtive gesture and the police said, are you armed? And they said, yes. And the police said, well, step out of the car and let's put your firearm, you know, in my back seat or something while we talk. And one where they pull over and someone has a firearm and they're stuffing under the seat. I do believe those are different situations, Your Honor. Just for the fact that when someone is, and the case law has gone through this, that in response to police presence, when someone appears to be hiding a weapon, the cases have said it would be foolhardy to not do a protective sweep and then officers can neutralize the threat and make sure that they're safe. And I guess what I'm getting at is it seems maybe that the furtive gesture itself could be indicative of dangerousness since you're trying to hide a weapon or potentially a weapon if we're spotting you that it's a gun, as opposed to someone who just says, yeah, I've got a gun. Correct, Your Honor. I do think that those are different situations. And again, it goes to, you know, what the officer is expecting and experiencing. You know, if they walk up on a car and they can see someone's hands and they say, I want you to know I have a firearm, that's a very different situation than someone doesn't stop immediately and they come up and they're making a dramatic gesture that looks like they're trying to hide something or reach for something. So I do think that those are important things. And I think you've already answered this, but it just seemed awfully fast getting into the car and looking for the gun. After they spotted, after they pulled him over. How does it, I mean, do you have, other than something we've talked about, do you have anything else that suggests that that timing doesn't matter or that that timing actually suggests they should have done what they did? I don't know. Excuse me, Your Honor, I don't mean to. Go ahead. Your Honor, I think that the timing actually goes to help support the fact that the protective sweep was done. I mean, the whole point of the protective sweep is officer safety. They want to make sure that during the encounter that they are going to be safe. And I think the fact is when they come up and they see this happening, they're immediately concerned based on their training and experience that this is an issue and they need to find out if they were, if Mr. Canada was reaching for a weapon or trying to hide a weapon. So they get him out, go straight to the place to see what he was hiding, find it's a gun. And then at that point, decide to detain him. And he says in the video, he says, you know, it's not illegal to own a gun in Kansas, but, you know, because of the way you're acting, we're going to just detain you while we figure out what's going on. I think that that really leads to support the protective sweep and the fact that they really were doing what they needed to do for their safety. That seems like they thought he wasn't dangerous. Well, I'm not sure if I, I'm not sure if I understand. Is there a question or I'm not. No, just an observation. Can I counsel, could I just ask you to respond to an argument that Mr. Canada made about the second problem or at least the district court's analysis of the second prong on access. The argument is that the way the district court analyzed access would render that prong, as Mr. Canada says, a nullity because there's always the possibility that the driver will be allowed to return to the vehicle. Why isn't that correct? Because I think that you have to look at what happened in the stop and what happens when the protective search happens and then when the arrest actually happens. There are plenty of cases. Let's walk through our case, for example. Let's say everything in Canada is exactly the same, except for Mr. Canada is not a prohibited possessor and he's not driving on a rebooked license. So they would have done the protective sweep. They found the gun. They run the checks. Everything comes back clear. And they say, hey, next time maybe don't reach back behind the seat and you're free to go. They'd go on his way. He would have been returned back to his vehicle at that point and would have been free to go on his way. And the case law is clear on the second point. I mean, the courts have ruled on this, that there is always the possibility of a return to a vehicle in a no arrest case. And unless you have someone that is known, that has an outstanding warrant that you know the minute you see them that they're going to be arrested and they're not going to be returning back, that could be a different situation. But that's not our situation. So I do think there could be situations where someone would absolutely return to the vehicle. But the case law is pretty clear that up until the moment of arrest, there's always opportunity for someone to return back to their car. And that's what happened in this case. But isn't the logical extension of that then that there's always going to be an access? There could be, Your Honor. But again, there's case law on it that says that this is the law. Well, I know about the case law. I'm just trying to work through the logic of this. If you haven't decided whether to arrest, there's always the possibility that they'll go back to the car. And that's determinative on the access issue. Why are we even talking about pronged to if that's the case? We're talking about pronged to, Your Honor, just because the courts tell us that we need to talk about pronged to. But I understand your point of what you're saying is it appears that a lot of times there's generally a possibility for them to go back. But those are the parameters in which we're working. And I believe that the case law supports that he would have been allowed to return the vehicle. Your Honors, the district court correctly ruled that the defendant's motion to press should be denied and the government asked that you affirm that decision. Are there any other questions? Thank you so much. Can we give him another minute? Sure. I asked Judge Matheson if we could add him a minute. Oh, thank you. There was a lot said in that last argument. Thank you. At the time I thought I had 50 seconds. I was going to make two points. I'll just go with that. The first point, the government keeps talking about precedent. I would encourage you to read the cases. The cases the government relies on are not this case. In almost every one of those cases, you have an individual who is known, an individual who has gang affiliation, prior criminal history, some connection to violence or a weapon. That's not this case. The other cases, there are things going on in the stop that just aren't present here. So I would encourage you to look at the cases because I think this case would be an extension of those cases if the government wins. And I think the last thing I'll leave you with just is, you know, the totality of the circumstances test, it considers factors that weigh against reasonable suspicion as well as factors that support reasonable suspicion. So in this case, this is a minor traffic infraction. It's not somebody casing a jewelry store. He failed to signal a right-hand turn from a right-hand turn lane. There was no information that he had committed, was committing, or was going to commit a crime, let alone a serious or violent crime. The officers, again, had no information who this man was, whether he had any outstanding warrants, prior criminal history, any history involving weapons, any gang affiliation, nothing. Unlike in Michigan v. Long, they did not suspect that he was intoxicated or under influence of drugs. He was not combative, belligerent, or confrontational. He had refused to roll down the window. He didn't flee or give evasive answers. He wasn't nervous. He complied with everything the officers asked him to do. Could I just jump in? Because we didn't talk about this earlier. What about the nighttime high-crime area factors? Could you speak to that? Sure. I think the briefing, you know, the night, the time of the stop, 9 p.m., there's not a case that exists that says that matters. I mean, this court's precedent is late at night, and every case involves, like, 1 a.m., 2 a.m., 3 a.m. So we don't think that there is precedent to support a stop at 9 p.m. matters. And I think that's because law-abiding people are out and about at 9 p.m., as opposed to midnight or 1 a.m. We are just out at 9 p.m. So there is nothing inherently suspicious about that. The high-crime area, fine. Judge Melgren says it's a high-crime area. Under these facts, I don't think it matters, because he's literally driving a vehicle down a road. That's what he's doing. He's not a part. There's no reason to suspect that he's ever even been there before. He's a motorist driving, and that is the critical distinction between this case and the other high-crime cases. When you look at the high-crime cases, these are cases where somebody's sitting in a parking lot at a home. There's some connection to the community. It's not a case where somebody is just driving by, and I think that's why Judge Melgren didn't consider any of that, because he realized, I mean, he said at the hearing, I drive through this intersection. I mean, everyone drives through this intersection. So, yeah, I mean, high-crime, because there are crimes committed at a gas station. Nothing to do with a motorist driving in the area. And I almost got through all my points. Thank you. And we're in the red zone here. Thank you, counsel. Thanks to both of you. We appreciate the arguments this morning. The case will be submitted.